UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | No. 4:15 CR 483 JAR |
| ) | |
| DONALD BRIAN HAVEY, D.C., ) | |
| ) | |
|     Defendant. ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM**

Comes now the United States of America, by and through its attorneys, Richard G. Callahan, United States Attorney for the Eastern District of Missouri, and Dorothy L. McMurtry, Assistant United States Attorney for said District, and submits the following in response to "Defendant's Objections to Presentence Investigation Report," Doc. # 20 and "Defendant Donald Havey's Sentencing Memorandum," Doc. # 21.  For the reasons stated below, the Government urges the Court to overrule the defendant's objections to the Presentence Report (PSR), deny the defendant's request for a variance, and impose a sentence within the guidelines range calculated by the U.S. Probation Office.

**Defendant's Objection to Role in the Offense Enhancement**

The Government disagrees with the defendant's statement that a role in the offense enhancement, pursuant to USSG § 3B1.1, was not anticipated by the parties.  During the plea negotiations, the Government advised the defendant that the Government would recommend a

1

role in the offense enhancement.  The parties did not agree on this enhancement and as a result the parties were not able to reach an agreement on the total offense level.

In support of his objection, the defendant argues that the notes on the use of the role in the offense enhancement suggest that it should only apply to criminal enterprises.[1]  The defendant is correct that this enhancement applies to criminal enterprises, which is exactly what the defendant devised and ran for several years.  "The [Sentencing] Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility."  USSG § 3B1.1, comment (backg'd).

The defendant's further suggestion that this enhancement does not apply because he was running a business is simply wrong.  The enhancement is properly applied to a defendant even if the business or organization had some legitimate purpose or business at its inception or during the fraud scheme.

To be applicable, Section 3B1.1 requires that there be at least two participants, that is, two persons who are criminally responsible for the commission of the offense and that the defendant be a leader, organizer, manager, or supervisor for one or more of the other participants.  USSG § 3B1.1, comment. (n.1-2).  The terms "leader," "organizer," "manager," and "supervisor" have been broadly construed under USSG § 3B1.1.  United States v. Frank, 354 F.3d 910, 926 (8th Cir. 2004); United States v. Erhart, 415 F.3d 965, 968 (8th Cir. 2005)

---

[1] The comments and background notes to USSG § 3B1.1 do not define the term "criminal enterprise."  However, the notes use several terms interchangeably to describe one or more persons participating in the commission of a criminal offense.  These terms are:  criminal enterprise, organization, criminal association, and conspiracy.  USSG § 3B1.1, comment. (n. 1-4.).

2

(recruiting new members into conspiracy supports enhancement as manager or supervisor); United States v. Bistrup, 449 F.3d 873, 883 (8th Cir. 2006) ("A defendant need not exercise direct control for a role enhancement to apply.").

In the addendum to the PSR, the probation officer has identified certain facts that support this enhancement.  The Government adopts, and will not repeat, these facts in this pleading.

However, there are other facts in the PSR (to which no objection has been raised), which indicate that the defendant directed Susan Reno Havey (hereafter Reno), an un-indicted co-conspirator, to submit false and fraudulent claims to Medicare and Medicaid.  Reno pled guilty to a misdemeanor offense based on some of the same conduct to which the defendant pled guilty.

Paragraph 22 of the PSR states that the defendant and Reno knowingly submitted claims before the boots were delivered and in some cases before the boots were even ordered.  They concealed this fact from Medicare, because they knew that Medicare would reimburse them only if they had delivered the products to the patients.  Paragraph 23 of the PSR states that the defendant and Reno used the names of several of the defendant's companies in submitting false and fraudulent claims, in order to conceal from Medicare the fact that the defendant was ordering and he and Reno were billing for a large number of very expensive orthotic boots.

Without direction from the defendant, Reno could not have submitted these false and fraudulent claims because she did not see patients and did not have information about the patients.  It was the defendant who decided which nursing homes he would visit and which patients would receive the orthotic boots.  It was the defendant who then gave the necessary patient information and related paperwork to Reno and told her what claims to submit.  The defendant also told Reno which of his companies should be listed on the claim.

The defendant further argues that the Government's charging decision - permitting Reno to plead to a misdemeanor - separated her conduct from his conduct and he can only be held liable for his own conduct.  There is no factual or legal basis for this statement.  The Government never agreed that the defendant would not be responsible for relevant conduct, as defined in USSG § 1B1.3.  Further, it cannot be argued that Reno's conduct is not relevant conduct.  The defendant asked and directed Reno to submit false and fraudulent claims, and knew that she was in fact submitting the false and fraudulent claims. Lastly, he received the proceeds from the fraudulent claims and retained the greater share of the illegal proceeds.

In summary, the fraud scheme to which the defendant pled guilty was extensive under USSG § 3B1.1(a) because the scheme included the defendant and Reno, who were criminally responsible participants in the scheme, and because the defendant employed or contracted with chiropractors in twelve states, established and used at least five different companies, and created and used a number of websites to carry out the scheme.  Throughout the scheme, the defendant was a leader and organizer for all the persons, including co-conspirator Reno, who were involved in the scheme.  See USSG § 3B1.1(a), comment. (n.3)("In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered."); United States v. Brown, 627 F.3d 1068, 1073 (8th Cir. 2010) ("Even if many of [a defendant's] cohorts were themselves innocent dupes, the four level enhancement was warranted because, without question, the criminal conduct was otherwise extensive.").

Considering all the facts, an argument can be made that four points should be added pursuant to USSG § 3B1.1(a).  However, the Government is not making this argument.  Instead,

4

the Government simply urges the Court to overrule the defendant's objection and to apply the two point enhancement under USSG § 3B1.1(c).

## 3553 Sentencing Factors

In determining a particular sentence to impose, the Court must consider, among other factors, the nature of the offense, the history and characteristics of the defendant, the need for the sentence imposed, the kinds of sentence available, and the guidelines sentencing range.  The Government will address some of these factors.

## Nature of the Offense

The defendant devised and executed a multi-year fraud scheme that resulted in Medicare and Medicaid suffering an actual loss of over $2.2 million dollars.  This loss does not include any payments (in the form of co-payments) made by patients and their families or representatives.

The scheme did not consist of a few isolated false claims, but rather was a well thought-out and well-planned scheme to defraud Medicare and Medicaid and to deceive all persons touched by the scheme.  The defendant recruited chiropractors in twelve states and gave them specific written instructions on how to present themselves to nursing home staff and patients.  Among other things, he told the chiropractors to target Medicare patients and to promote the program as a fall prevention program and to conceal the fact that the true purpose was selling the boots.  The defendant also tricked the patients and their families into believing that there was no cost to them, when he knew the potential co-payment was as much as $500.  The defendant created a number of companies, with the sole intent of making it more difficult for Medicare to monitor the claims he and Reno were submitting.

5

As early as 2008, Medicare began questioning the claims submitted by the defendant and Reno. Instead of correcting the claims, in some instances, the defendant and Reno appealed and submitted false documents to the administrative law judge. The defendant also gave false testimony in the proceeding before the administrative law judge. Later, in response to federal subpoenas, the defendant and Reno created and produced false documents that contained the forged signatures of other chiropractors.

**History and Characteristics of the Defendant**

In support of his request for a variance, the defendant asks the Court to favorably consider that he has no criminal history, has a strong and successful academic background, is a licensed chiropractor, and has the support of his family and friends. The Government does not dispute these facts, but suggests that these facts support a sentence within the guideline range.

The defendant did not need to engage in criminal acts to make a comfortable living. He had the professional education, skills, and license as a chiropractor to support himself and his family. The defendant made a decision, deliberately and repeatedly, to engage in this fraud scheme and the Government asserts that the motive was greed, not need.

The defendant and Reno argue at length that the defendant designed the boots and created the business because he wanted to help patients. This argument misses the mark and does not explain why he engaged in the fraud scheme. If the defendant truly believed that the boots were beneficial to patients, he could have sold the boots to patients, accurately described the boots on the reimbursement claims, and Medicare would have paid him approximately $200 for a pair of boots. However, the defendant wanted much more than $200 - he wanted $2400 to $2600 for

6

each pair of boots. By falsifying his claims to Medicare and Medicaid, he was able to receive at least $2200 more than he would have received based on truthful claims.

In his sentencing memorandum, the defendant refers to few patients who benefitted from wearing the boots. The Government does not take issue with the defendant's assertion that a handful of patients may have benefitted from the boots. However, even as to these patients, the defendant falsified the claims for the boots and received $2400 to $2600 for the boots when he should have received about $200.

Furthermore, the plea agreement has taken into account those few patients who may have received a benefit from the boots. As part of the plea negotiations, the Government stipulated that the amount of the actual loss and the restitution is $2,276,221, instead of the $2,529,134 that the defendant actually received from Medicare and Medicaid. Arguably, the intended loss would be even greater than the paid amount of $2,529,134, because Medicare and Medicaid denied and did not pay some claims.

The defendant also identifies two persons associated with two care facilities, a chiropractor, and a relative of a patient, who provide favorable comments about the boots. Of course, it is unlikely that these individuals know that the defendant falsified the claims and received $2400-$2600 for the pair of shoes. Moreover, these individuals definitely do not represent the majority of nursing home staff and patients. Staff at numerous nursing homes have stated that the boots did not reduce falls, actually increased falls, caused chafing and tears of the skin, were difficult for many patients to wear, and were generally not worn. Relatives of patients have stated they would not have consented if they had known how much Medicare was paying for the shoes and the amount of their co-payment.

The defendant asks the Court to consider that he initially had no intent to defraud when he began his business and only began submitting fraudulent claims because of cash flow problems. The Government does not accept the defendant's statement concerning his initial lack of fraudulent intent because the Government has not found any claims submitted by the defendant that accurately described the boots. The defendant had to know that the boots provided to his patients differed drastically from the boots described in the claims. At the sentencing hearing, the Government will present evidence that shows the stark differences.

**Need for Guideline Sentence**

The defendant requests a variance and argues that the nature of the offense, his personal history, and other factors make a sentence of 12 months and a day an appropriate sentence. The Government strongly opposes this request. None of the factors relied on by the defendant warrant a variance.

As discussed above, the defendant devised and executed an extensive multi-year fraud scheme that resulted in a loss of over $2.2 million. A sentence within the guideline range is necessary to reflect the seriousness of this offense, to promote respect for the law, and to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct by the defendant and others.

**Fast Track Reduction**

The defendant suggests that in other districts he would receive a "fast track" four point reduction. The Court need not consider whether other districts would grant such a reduction, because in no way did this case proceed on a fast track. The defendant did not plead guilty until

8

October 22, 2015, over two years after being informed of the investigation and months after the government disclosed the evidence against him.

**Early and Extraordinary Acceptance of Responsibility**

The defendant also asserts that he has demonstrated an "extraordinary" early acceptance of responsibility. He argues that this negated the need for the Government to engage in a "continued and protracted investigation."

The defendant's argument ignores the facts. As the defendant recognizes on page two of his sentencing memorandum, the Government conducted a two-year intensive investigation of the defendant, Reno, and their respective businesses.

In June 2013, Government counsel and agents met for the first time with the attorney representing the defendant at the time. The Government disclosed the evidence that it had gathered to that date. This was done so the attorney and the defendant, if he chose, could begin discussions concerning a possible disposition of the alleged charges. The defendant did not indicate any interest in such discussions.

Following this meeting, over the next two years, the Government interviewed numerous witnesses, including orthotics experts, patients, nursing home staff, chiropractors, and others associated with the defendant and Reno. The Government also issued a number of subpoenas to the defendant, Reno, and their businesses. At no time during the two-year investigation did the defendant indicate a desire to resolve the matter.

In letters dated April 16, 2015, the Government informed the defendant and Reno that formal charges would be brought against them. The defendant and Reno retained an attorney

9

and the Government met with them and their attorney and showed them a detailed power point of the evidence against them.

After that, in or about May 2015, the defendant retained his current attorney, Paul D'Agrosa. The Government agreed to delay the indictment because of Mr. D'Agrosa's schedule and his need to become acquainted with the facts of the case. In July 2015, the government once again presented evidence that established that the defendant had committed health care fraud.

It was not until October 2015, that the defendant finally pled guilty. Notably, on the eve of the plea, the defendant was still claiming he did not know the codes on the claims were false and fraudulent.

It is clear that the defendant did not demonstrate an early or extraordinary acceptance of responsibility. Moreover, the defendant has already received the benefit of a three-point reduction for acceptance of responsibility pursuant to USSG §3E1.1(a) and (b). Although some of the defendant's statements in his sentencing memorandum appear to be inconsistent with acceptance of responsibility for all of his illegal conduct, the Government will not present evidence at the sentencing hearing and will not argue to the Court that the reduction for acceptance should not be granted. However, the Government opposes any further reduction or variance based on acceptance of responsibility.

**<u>Defendant's Attempts to Minimize His Illegal Conduct</u>**

Throughout his sentencing memorandum, the defendant attempts to minimize his responsibility for his illegal conduct by shifting blame to others. He, and Reno in her letter of support, argue that the defendant did not initially have any intent to defraud. Further, they assert that the defendant's business partner wrote the original fall prevention manual, came up with the

10

idea of regional managers and going nationwide, and ran the program for a period after the defendant broke his hip in 2008.

None of this is relevant to the offense charged in the information and the conduct to which the defendant stipulated and pled guilty.  According to the defendant, his business partner died in 2009; therefore, the defendant was in charge of the business and executed the scheme after his death.  It is the conduct after the death of the partner that is the basis of the offense to which the defendant pled guilty.  As stated in paragraph 4(s) on page 6 of the plea agreement, the fraud scheme began in or about 2009 and continued to in or about 2014.  Further, the specific false claims, identified in the plea agreement on pages 8 and 9, were submitted in 2011, long after the death of the defendant's business partner.

The defendant next argues that he and Reno relied on the manufacturers to determine the correct billing codes.  In her letter, Reno states: "neither Don nor I had ANY experience with DME or how to bill insurance for the items . . ."

This argument is simply not credible.  First and foremost, the manufacturers were not billing Medicare and Medicaid for the boots; the defendant and Reno were submitting the claims to Medicare and were responsible for ensuring the codes accurately described the boots. Additionally, the manufacturers deny that they told the defendant and Reno to use the combination of codes that they used on the claims submitted to Medicare and Medicaid.  Even if one assumes that there was an initial reliance on the manufacturers' advice, the defendant and Reno could not continue to rely in <u>good faith</u> on this advice when Medicare was continually questioning and denying their claims.

11

Moreover, Reno has owned and operated Pinnacle Billing and Collections (Pinnacle) for over ten years.  On the website designed by Reno, Pinnacle is described as "Specializing in Chiropractic & DME."  The acronym "DME" stands for durable medical equipment, which includes the boots sold by the defendant.  Thus, Reno cannot credibly argue that she was not familiar with DME billing.  Further, the defendant and Reno had access, at no cost, to Medicare and other sources to determine the correct codes to use in billing for the boots.

**Loss of License and Practice**

Licensed health care professionals, such as chiropractors, know from the moment that they apply for and get their licenses that they may lose their licenses if they engage in criminal conduct.  The media and professional journals constantly report on health care professionals who are charged, convicted, lose their licenses, and in some cases their liberty.  The defendant knew these were the possible consequences that he faced if his fraud was detected.  Lured by greed, he rolled the dice and lost.

In any event, the loss of his professional license is not sufficient punishment for the defendant's crimes.  The defendant did not engage in conduct that was merely unethical or unprofessional, for which a loss of his license might be sufficient and appropriate punishment.  He engaged in serious criminal conduct and brought many others into the fraud scheme.

## CONCLUSION

For the reasons discussed above, the Government respectfully urges the Court to overrule the defendant's objection to the role in offense enhancement and find that the total offense level is 25, deny the defendant's request for a variance, and impose a sentence within the guidelines range of 57-71 months, as calculated by the U.S. Probation Office.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney


 */s/ Dorothy L. McMurtry*
DOROTHY L. McMURTRY, #37727MO
Assistant United States Attorney
111 S. 10th Street, Room 20.333
St. Louis, Missouri 63l02
(314) 539-2200

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2016, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all counsel of record.

 */s/ Dorothy L. McMurtry*
DOROTHY L. McMURTRY, #37727MO
Assistant United States Attorney